IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DENINE PIERCE,**                                     Case No. 1:18 CV 543

     Plaintiff,                                     Judge Benita Y. Pearson

     v.                                                       Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                     REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Denine Pierce ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated March 9, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed for SSI in February 2015, alleging a disability onset date of January 1, 2010. (Tr. 185).[1] Her claims were denied initially and upon reconsideration. (Tr. 114-

---

1. Plaintiff previously applied for SSI in March 2012, and an ALJ found her not disabled in September 2013. *See* Tr. 77-91. The ALJ in the instant case found no basis for reopening Plaintiff's prior application (Tr. 11), therefore the relevant time period in this case begins on the date of Plaintiff's protective filing – February 6, 2015. *Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir.1993) ("The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after the application date."); 20 C.F.R. § 416.330 ("If you file an application for SSI benefits before the first month you meet all the other requirements for

15). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 147). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 5, 2016. (Tr. 34-73). On March 10, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on March 9, 2018. (Doc. 1).

## Factual Background

Personal Background and Testimony

Born in 1966, Plaintiff was 48 years old at the time of her application, and 50 at the time of the ALJ hearing. *See* Tr. 42, 185. She graduated from high school and studied communications for two years in college, receiving an Associate's Degree. (Tr. 42-43). Plaintiff also had training as a CNA and as a loan officer. (Tr. 43). At the hearing, the ALJ clarified with Plaintiff's counsel that Plaintiff alleged disability due to cervical degenerative disc disease, Hepatitis C, major depressive disorder, anxiety, Wells disease, obesity, asthma, COPD, diabetes, hypertension, and moderate obstructive sleep apnea. (Tr. 40-41).

At the time of the hearing, Plaintiff lived in an apartment on the second floor with her twenty-year-old son. (Tr. 41). She used a cane and pulled on railings to go up the stairs. *Id.* Plaintiff testified she could not work due to illnesses caused by hepatitis, a neck problem, anxiety, and "not being able to sit or stand for a very long time." (Tr. 47-48). She attributed her inability to sit to her anxiety. (Tr. 48) ("I get anxious and I got to stand up[.]").

---

eligibility, the application will remain in effect from the date it is filed until . . . the hearing decision is issued.").

Plaintiff stopped driving in 2007 due to eyesight problems, shaking hands, and anxiety. (Tr. 43-44). Plaintiff lost her license after being in an accident. (Tr. 44). For transportation, she relied on family members, friends, or paratransit. (Tr. 45).

Plaintiff's hepatitis caused symptoms of chills and sweats, vomiting, and stomach pain approximately twice per week. (Tr. 49). It took her about two to three days to recover from these episodes. *Id.* Plaintiff's physician was awaiting insurance approval to prescribe a new medication. (Tr. 49-50). Plaintiff experienced anxiety which included, in her words "[p]aranoia, schizophrenia, hearing voices, just like wow" and she "really [did not] like being around people." (Tr. 50-51). She had these symptoms for the past four to five years; she saw a psychiatrist once or twice per month and took gabapentin and Prozac. (Tr. 50-51). Plaintiff avoided interacting with people, but spoke with family members and friends on the phone. (Tr. 51-52). She saw her grandchild twice per month and talked with on the phone. (Tr. 54).

Plaintiff had received cortisone shots and physical therapy for her neck pain. (Tr. 54-55).

Plaintiff also testified to breathing problems that started in approximately 2014. (Tr. 56). Plaintiff had gained weight ("up and down like 20 pounds up, more up") due to taking prednisone. (Tr. 45). She testified that her weight made breathing difficult (Tr. 45) and stopped her from walking long distances (Tr. 56). Plaintiff also testified she had been hospitalized three times in 2016. (Tr. 56). She used a nebulizer, Symbicort, and albuterol to treat her breathing problems. *Id.* These medications helped "for the most part"; on a few occasions she required emergency treatment after overexerting herself. (Tr. 58).

Plaintiff experienced numbness in her legs due to diabetes and had a dropped foot due to nerve damage. (Tr. 61).

Plaintiff's son did the laundry, shopping, cleaning, and dishes. (Tr. 42, 58-59). Plaintiff no longer cooked because she "really shouldn't be around the fumes, the gas and stuff". (Tr. 59). She was able to make her own bed. *Id.* During the day, Plaintiff watched television (approximately six hours per day), read books (approximately three hours per day), and sometimes sat on her porch. (Tr. 59-60). Plaintiff also attended approximately three medical appointments per week. (Tr. 60-61).

Plaintiff used a walker at the time of the hearing. (Tr. 63). She testified it, along with a cane, were prescribed by Dr. Karen Kea due to her breathing diffuclties. *Id.* She was unable to walk unassisted. (Tr. 64). She also testified the walker was necessary due to the numbness in her legs, and her anxiety about falling, however, it was prescribed for breathing. *Id.*

Relevant Medical Evidence[2]

*Prior to Application Date*

In April 2014, Plaintiff underwent a pulmonary function test suggesting "the presence of a possible both and [sic] restrictive ventilatory impairment." (Tr. 527). The physician recommended further testing "to clarify", and noted "[n]o significant change from the previous exam." *Id.* Karen Majewski, CNP, noted Plaintiff's "breathing [was] good until a few weeks ago." (Tr. 528). She was "on prednisone per her dermatologist and [it] does not affect her breathing". *Id.* She reported shortness of breath and difficulty walking long distances. *Id.* On examination, Plaintiff was in "mild distress with [a] dry cough"; her lungs had "[g]ood breath sounds; no wheezes, rales or

---

2. Although Plaintiff suffers from both physical and mental impairments, the arguments raised before this Court only implicate the former. *See* Doc. 10. As such, the undersigned summarizes only records related to Plaintiff's physical impairments. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief deemed waived).

rhonchi"; she had normal percussion and good diaphragmatic excursion. (Tr. 530). Ms. Majewski prescribed a trial of Symbicort. (Tr. 532).

In July 2014, Plaintiff saw internal medicine physician Karen Kea, M.D., complaining of, *inter alia*, pain in her neck, shoulders, and lower back. (Tr. 509). On examination, she had no edema, and Dr. Kea assessed chronic neck pain, among other things. *Id.* The same day, Plaintiff saw a nutritionist with a goal of losing weight. (Tr. 503). Plaintiff reported moderate activity of walking daily, and that she shopped and cooked. *Id.* The nutritionist recommended attending group exercise classes, eating three small meals per day, and baking foods instead of frying. (Tr. 504). He noted Plaintiff's obesity was "related to inactivity & inconsistent meal pattern." *Id.*

In September 2014, Plaintiff had a hysterectomy. *See* Tr. 466. At a follow up appointment in October 2014, Plaintiff answered "no" to the question "Do you use or should you be using crutches, cane, walker, or wheelchair?" (Tr. 455).

Plaintiff saw Dr. Kea again in November 2014 for left knee and lower back pain. (Tr. 448-49). Dr. Kea noted no edema, assessed low back pain and cervical degenerative disc disease, and referred Plaintiff to the pain clinic. *Id.* In December, Plaintiff saw orthopedist Andrew Tsai, M.D., for left knee pain. (Tr. 443). She walked with a cane. *Id.* On examination, she had normal musculature, normal gait and station, and normal muscle strength; she had intact sensation and no edema. (Tr. 446-47). Dr. Tsai also noted Plaintiff had no wheezes or rales, and breathed comfortably on room air. (Tr. 446). She had some reduced range of motion, tenderness and crepitus in her left knee. (Tr. 447). Dr. Tsai took x-rays, which showed minimal degenerative changes (Tr. 563-65), and assessed left knee patellofemoral syndrome and generalized osteoarthritis (Tr. 447). He prescribed Mobic and recommended physical therapy for quadricep strengthening and patellofemoral pain. *Id.*

5

Plaintiff returned to Dr. Kea in January 2015, at which time she was noted to be using a walker. (Tr. 667-69). Plaintiff reported fatigue beginning two weeks prior around the time she had the flu. (Tr. 668). Dr. Kea deferred an examination, assessed hyperlipidemia, noted a family history of diabetes, and ordered lab work. *Id.*

*After Application Date*

At a March 2015 appointment, Plaintiff complained of a rash, a frequent cough, and shortness of breath with exertion. (Tr. 404). She also reported lower energy, night sweats, and chronic left flank pain. *Id.* On examination, Plaintiff had normal respirations; her lungs were clear, without wheezing, rales, or rhonchi. (Tr. 407). She had normal motor strength, no edema, no spinous tenderness, and normal gait. *Id.*

The following month, Plaintiff attended a follow-up appointment. (Tr. 607-11). On examination, she had full motor strength, normal gait, no edema, no spinous tenderness, and negative pulmonary findings. (Tr. 610-11).

Plaintiff returned to Dr. Kea in June 2015, requesting forms completed for a fishing license under disability and an "RTA appeal form." (Tr. 582).

That same month Plaintiff underwent a pulmonary function test which showed results "consistent with a moderate obstructive ventilatory defect without a significant response to inhaled bronchodilators, with air trapping"; Plaintiff also had a reduced diffusion capacity consistent with the diagnosis of COPD, and there was "evidence of possible expiratory respiratory muscle weakness." (Tr. 1047).[3] Plaintiff also underwent an exercise oximetry study, which revealed "no significant oxygen desaturations" while Plaintiff was "walking at a normal pace and breathing

---

3. This record is duplicated at Tr. 1166-68.

ambient air. *Id.* She was able to walk 528 feet, and reported "mild dyspnea" at the end. *Id.* She "stopped walking after 4 minutes due to shortness of breath." *Id.*

At an appointment the following month, a progress note indicates Plaintiff's primary diagnosis was right foot drop, with other diagnoses including somatic dysfunction of the cervical, thoracic, and lumbar regions, and cervical degenerative disc disease. (Tr. 1097).

In September 2015, Plaintiff underwent a rheumatology consultation for joint pain. (Tr. 1194-1201). She denied shortness of breath, wheezing, or cough. (Tr. 1199). On examination, she had normal pulmonary findings, no edema, and a normal gait. *Id.* She had full range of motion in her shoulders, elbows, wrists, knees, and ankles, with some pain in her left shoulder, left knee, and left ankle. (Tr. 1200). Maria Antonelli, M.D., assessed rotator cuff syndrome of the left shoulder, osteoarthritis of the left knee, and numbness of the left foot. *Id.* She recommended physical therapy for Plaintiff's shoulder and knee, and discussed Plaintiff's foot numbness, noting it was "intermittent . . . 1-2x per day for only minutes at a time". (Tr. 1201). Dr. Antonelli suggested an EMG, but Plaintiff declined. *Id.*

In October 2015, Plaintiff underwent a physical therapy evaluation. (Tr. 1287-90). The therapist noted Plaintiff "walked into therapy today independent without AD". (Tr. 1287). On examination, she had decreased lordosis, rounded shoulders, and tenderness in her left knee and left shoulder joint. (Tr. 1288). She also had some decreased strength and range of motion findings. *Id.* The therapist recommended treatment once or twice per week for ten visits, and believed Plaintiff's prognosis to be good. (Tr. 1290).

Plaintiff went to the emergency room with an asthma exacerbation in December 2015. (Tr. 887-89). Her wheezing "improved significantly after breathing treatments" and she was "in no respiratory distress." (Tr. 888).

Plaintiff saw Dr. Kea in December 2015, reporting flank pain, hair falling out, and chest pressure. (Tr. 1312). She was noted to be using a cane or crutches. *Id.* Dr. Kea's examination revealed no positive findings in Plaintiff's abdomen. (Tr. 1313). She assessed elevated glucose, chronic hepatitis, and flank pain; she ordered lab work. *Id.*

Plaintiff returned to the emergency room in January 2016 reporting shortness of breath and left upper quadrant abdominal pain. (Tr. 915). An abdominal CT scan revealed "[n]o acute intra-abdominal abnormality", mild fatty infiltration of the liver, and colonic diverticuli without diverticulitis. (Tr. 918). An Acute abdominal series showed "[n]o specific nonobstructive bowel gas pattern and no acute pulmonary disease." (Tr. 917-18). Plaintiff was prescribed medication and discharged. (Tr. 920).

In February 2016, Plaintiff saw a physician with the Department of Physical Medicine and Rehabilitation for an evaluation of chronic low back pain. (Tr. 1388). She reported constant pain, aggravated by prolonged standing, bending, and twisting at the neck. *Id.* She also reported intermittent numbness and tingling in the left arm, right ankle weakness, and a diagnosis of foot drop. *Id.* She "denie[d] falls or gait change." *Id.* On examination, Plaintiff had mild tenderness in the left upper trapezius, over the lower cervical spinous processes, and over the left lower cervical paraspinals. (Tr. 1394). She had mildly reduced neck range of motion in extension and left lateral rotation. *Id.* She had full strength in her extremities, with "giveway weakness in non myotomal pattern of LUE and LLE." (Tr. 1395). Plaintiff's gait was normal, she denied shortness of breath or cough, and her respiratory examination was normal. (Tr. 1394-95). The provider's impression was cervical spondylosis without radiculopathy; she noted Plaintiff's anxiety appeared to exacerbate her pain/disability. *Id.* She recommended Plaintiff continue physical therapy, and try gabapentin. *Id.*

In March 2016, Plaintiff went to the emergency room with shortness of breath. *See* Tr. 941-1031. Plaintiff reported a productive cough starting two days prior, with increasing shortness of breath. (Tr. 951). Her inhaler helped some, but not completely, and she also had body aches, dizziness, and headaches. *Id.* Plaintiff was noted to have a cane and walker. (Tr. 962-63). Plaintiff tested positive for influenza. (Tr. 955). Providers assessed Influenza A and an asthma exacerbation. *Id.* Plaintiff was admitted overnight, and discharged the following day. (Tr. 950).

In April 2016, Plaintiff saw Khaleel Deeb, M.D., to follow up on asthma, diabetes, and hypertension. (Tr. 854-56). She reported asthma treatment provided significant relief. (Tr. 854). Plaintiff denied any musculoskeletal or neurological difficulties. (Tr. 855). On examination she had normal range of motion, no edema, and no tenderness. *Id.* She had normal muscle tone, gait, and coordination. *Id.* Dr. Deeb assessed diabetes without complication, essential hypertension, insomnia, Wells syndrome, asthma exacerbation, and moderate persistent asthma without complication. (Tr. 856).

In May 2016, Plaintiff underwent a consultation with Basem Haddad, M.D., for her pulmonary problems. (Tr. 869). On examination, Dr. Haddad noted Plaintiff had a normal range of motion, strength and tone; she also had normal gait, coordination, and sensation. (Tr. 871). Dr. Haddad assessed chronic obstructive pulmonary disease, "[m]oderate based on her most recent PFT" from June 2015. *Id.* He noted it "appear[ed] to be well controlled with current regimen." *Id.* He ordered a sleep study and counseled Plaintiff on smoking cessation. *Id.* A sleep study performed in August showed moderate obstructive sleep apnea. (Tr. 873).

In July 2016, Dr. Kea wrote a "To Whom It May Concern" letter stating that "it would be dangerous and potentially life-threatening for [Plaintiff] not to have air conditioning" due to her moderate COPD. (Tr. 1035).

Plaintiff returned to Dr. Kea in August 2016, reporting recurring pain in her left rib area. (Tr. 1672). Dr. Kea noted Plaintiff was applying for disability "due to foot drop, back and neck pain caused by [degenerative joint disease]." *Id.* On examination, she had slight tenderness in the left lower lateral rib and no edema. *Id.* Dr. Kea recommended warm compresses. (Tr. 1673).

From October 2014 through June 2015, Plaintiff's body mass index ("BMI") was noted to be between 29.87 and 32.44. *See* Tr. 407, 419, 426, 432, 434, 448, 450, 454, 460, 465, 584, 635, 662.

*Opinion Evidence*

In April 2015, State agency physician Leon Hughes, M.D., reviewed Plaintiff's records and offered an opinion as to Plaintiff's physical residual functional capacity. (Tr. 110-11). He opined Plaintiff could occasionally lift and carry 50 pounds, and frequently lift or carry 25 pounds. (Tr. 110). She could stand/walk or sit for a total of six hours each in an eight-hour workday. *Id.* Dr. Hughes opined Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 111). He noted this RFC was an adoption of a prior ALJ's RFC. *Id.* Dr. Hughes also noted that the recent medical evidence of record "does not indicate a need for a cane or walker[.]" (Tr. 110).

In August 2015, State agency physician Abraham Mikalov, M.D., reviewed Plaintiff's records and affirmed Dr. Hughes's opinion. (Tr. 123-24).

In October 2016, Dr. Kea completed a physical functional capacity report form. (Tr. 1716-20). In it, she noted she saw Plaintiff every three to four months for the prior sixteen years. (Tr. 1716). She listed Plaintiff's diagnoses as diabetes, degenerative disc disease of the spine, COPD, foot drop, and bipolar disorder. *Id.* Plaintiff's prognosis was "chronic", her symptoms were "dyspnea [and] pain", with pain in her neck, knees, pelvis, and shoulder. *Id.* As the "clinical

10

findings and objective signs", Dr. Kea noted "x-rays." *Id.* For treatment, she noted "anti-inflammatory meds; topical anesthetic." *Id.* She opined Plaintiff was not a malingerer, and that her impairments had lasted or could be expected to last at least twelve months. *Id.* She noted Plaintiff's anxiety contributed to the severity of her symptoms. (Tr. 1717). She thought Plaintiff's pain or other symptoms interfered with the attention and concentration needed to perform even simple work tasks "occasionally".[4] She thought Plaintiff was capable of low stress jobs, noting Plaintiff's stress increased with illness flares. *Id.* Dr. Kea opined Plaintiff could sit for two hours at one time, and two hours total in an eight-hour workday. (Tr. 1717-18). Plaintiff could stand for twenty minutes at one time, and stand/walk for about two hours total in an eight-hour workday. (Tr. 1718). Plaintiff would need to walk every thirty minutes for ten minutes at a time during an eight-hour workday, and required a job that permitted shifting positions at will. *Id.* Dr. Kea believed Plaintiff would require fifteen-minute unscheduled breaks every hour during an eight-hour workday. *Id.* Dr. Kea opined she would need to elevate her legs 90 percent of the day in a sedentary job. *Id.* She also noted Plaintiff needed a cane or other assistive device for occasional standing and walking. (Tr. 1719). Dr. Kea opined Plaintiff could occasionally lift less than ten pounds, rarely[5] lift 10 pounds, and never lift more. *Id.* Plaintiff could occasionally look down or turn her head left or right, but frequently look up or hold her head in a static position. *Id.* She thought Plaintiff could occasionally climb stairs, rarely twist, and never stoop, crouch, squat, or climb ladders. *Id.* She estimated Plaintiff would be absent from work more than four days per month as the result of impairments or treatment. (Tr. 1720). The final question on the form asked Dr. Kea to: "[p]lease describe any other limitations (such as psychological limitations, limited vision, difficulty hearing,

---

4. The form defined "occasionally" as "6% to 33% of an 8-hour working day." (Tr. 1717).
5. The form defined "rarely" as "1% to 5% of an 8-hour working day." (Tr. 1717).

need to avoid temperature extremes, wetness, humidity, noise, dust, fumes, gases or hazards, etc.) that would affect your patient's ability to work at a regular job on a sustained basis." *Id.* Dr. Kea wrote: "[history of] mental health issues exacerbated by illness." *Id.*

VE Testimony

A VE also appeared and testified at the ALJ hearing. (Tr. 65-72). The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past work experience who was limited in the way in which the ALJ ultimately found Plaintiff to be. (Tr. 66-67). The VE testified such an individual could perform jobs such as hand packager, hospital cleaner, or kitchen helper. (Tr. 67). Plaintiff's counsel asked what effect adding a restriction that the person has to work in an air-conditioned environment would have on these jobs. (Tr. 67-68). The VE responded that it "[r]eally depends on the setting" and "[b]ased on [her] experience and training and education, I would say that most of those positions could be performed in air-conditioned, but to give you an actual percentage, I can't." (Tr. 68). The VE also testified that a person cannot miss more than one day of work per month and perform these jobs, nor could the person be off-task more than fifteen percent of the workday. (Tr. 71).

ALJ Decision

In her March 10, 2017 written decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since February 6, 2015, her application date. (Tr. 12). The ALJ found Plaintiff had severe impairments of: other and unspecified arthropathies, other disorders of the respiratory system, other disorders of the gastrointestinal system, affective disorders, anxiety disorders, hepatitis C virus, and cervical degenerative joint disease. (Tr. 13). The ALJ also noted she considered Plaintiff's obesity, but found it not severe because there was "no evidence of any specific or quantifiable impact of the claimant's obesity on her pulmonary, musculoskeletal,

endocrine, or cardiac functioning and the highest body mass index has not exceeded 35." *Id.* The ALJ then concluded Plaintiff did not have an impairment or combination of impairments that meets or medically equaled a listed impairment. (Tr. 13-14). Thereafter, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform medium exertional work with additional non-exertional limitations:

> [T]he claimant can understand, remember, and carry out instructions consistent with performing only unskilled work and can maintain concentration, persistence, or pace for unskilled work. She cannot perform tasks involving interaction with the public. She can interact with coworkers and supervisors to speak, signal, and receive instructions but cannot negotiate, resolve conflicts, mentor, or perform management type interactions. She is limited to routine type changes in the work setting. Finally, she must have no more than frequent exposure to dusts, odors, fumes, and pulmonary irritants.

(Tr. 16). Based on the testimony of the VE, the ALJ found – considering Plaintiff's age, education, work experience, and RFC – there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (Tr. 21). Therefore, the ALJ found Plaintiff not disabled. (Tr. 21-22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises two challenges to the ALJ's decision. First, she contends the ALJ did not provide the regulation-required "good reasons" for discounting the opinion of treating physician, Dr. Kea. Second, she contends the ALJ's RFC is unsupported and the ALJ erred at Step Five. For the reasons discussed below, the undersigned recommends the decision be affirmed.

<u>Treating Physician Rule</u>

ALJs must adhere to certain governing standards when assessing the medical evidence supplied in support of a claim. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242–43 (6th Cir. 2007) (citing SSR 96-2p, 1996 WL 374188)[6]; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Generally, treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone"; thus, their opinions are generally given more weight than those of non-treating physicians. 20 C.F.R. § 416.927(c). Therefore, "if the opinion of the treating physician as to the nature and severity of a claimant's conditions is 'well-supported by medically acceptable clinical and

---

6. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply only to claims filed after March 27, 2017. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2015 and thus the ALJ applied – and the undersigned applies – the previous version of the regulations.

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record,' then it will be accorded controlling weight." *Rogers*, 486 F.3d at 242 (quoting *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 416.927(c)(2).

If a treating physician's opinion is not given controlling weight, the ALJ must provide "good reasons" as to the weight given instead. 20 C.F.R. § 416.927(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR 96-2p, 1996 WL 374188, at *5).

To demonstrate "good reasons," the ALJ must weigh certain factors in determining how much weight to afford a treating physician's opinion. *See Wilson*, 378 F.3d at 544 (listing factors for the ALJ to consider to determine what weight is appropriate, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the physician; and any other relevant factors). "A failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers*, 486 F.3d at 243).

While the ALJ is required to consider every piece of medical evidence, she is not required to repeat each piece of medical evidence when evaluating a medical opinion. *See, e.g., Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016). And, an ALJ may sufficiently address a treating physician's opinion by indirectly attacking the opinion's supportability and consistence

16

with the record as a whole. *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006).

Following her evaluation of the record evidence (Tr. 16-19), the ALJ explained her consideration of Dr. Kea's opinion:

> Little weight is given to the medical source statement completed by the claimant's treating physician, Karen Kea, M.D.[,] dated October 4, 20[1]6, which found that the claimant is limited to sitting for two hours in an eight-hour day, standing and walking for two hours in an eight-hour day, rarely lifting 10 pounds and never lifting 20 pounds or more and would be absent four or more days a month because such limitations are inconsistent with the evidence in the record. The claimant's relatively benign findings establish that she is not that limited and can perform a range of medium work (C32F).

(Tr. 19).

The undersigned finds the ALJ's evaluation of Dr. Kea's opinion supported by substantial evidence. On the two pages prior to the above analysis, the ALJ reviewed Plaintiff's records and explained that she found they showed "findings . . . largely no more than moderate in nature" and that Plaintiff's "conditions have proven largely responsive to her prescribed treatment". (Tr. 17). Specifically, the ALJ noted that while Plaintiff had some degenerative changes in her knees demonstrated on x-rays, her physician suggested "that these abnormalities were only mild in nature." (Tr. 17) (citing Tr. 563, 565) (indicting "minimal" degenerative changes). The ALJ continued, noting Plaintiff's repeated findings of normal gait, and relatively full muscle strength. *Id.* (citing Tr. 407, 611, 954, 1199). Moreover, the ALJ concluded, "as recently as April of 2[01]6, the claimant reportedly denied symptoms of myalgias, back pain, joint pain, neck pain, or arthralgias and underwent a normal musculoskeletal and neurological evaluation including her demonstration of a normal range of motion and gait." *Id.* (citing Tr. 855).

The ALJ performed a similar analysis regarding Plaintiff's cervical spine degenerative joint disease, noting it to be "similarly moderate" in nature. (Tr. 17). Although the ALJ acknowledged

that 2011 x-rays showed degenerative changes (Tr. 540), she also noted that "more recent clinical findings have been relatively mild". (Tr. 17). This is supported by the record. *See, e.g.*, Tr. 1394-95 (February 2016 findings of "mildly reduced" neck range of motion, and "mild tenderness" but no objective signs of cervical radiculitis); Tr. 871 (May 2016 musculoskeletal findings of normal range of motion, strength and tone, and normal motor and sensory function).

Further, the ALJ noted that "[a] similar pattern emerges with respect to the clinical evidence relating to the claimant's gastrointestinal disorders and hepatitis C virus." (Tr. 18). Again, the ALJ acknowledged Plaintiff's January 2016 complaints of abdominal pain, nausea, and constipation, but also noted that a contemporaneous abdominal CT scan and abdominal evaluation were unremarkable. (Tr. 18) (citing Tr. 916 (abdominal evaluation noting no tenderness, no rigidity, no rebound, and no guarding); Tr. 918 (CT scan showing "no acute intra-abdominal abnormality")). Moreover, the ALJ again accurately noted that in more recent medical records, Plaintiff "denied any abdominal pain or other gastrointestinal symptoms". *Id.* (citing Tr. 869). In conclusion, the ALJ explained:

> Ultimately, these repeatedly modest objective findings, the episodic nature of any subjective complaints to treatment providers, and the largely modest diagnostic test results appearing in the claimant's treatment records suggest that the claimant has a wider capacity for basic physical work activities and appear indicative of the ability to engage in medium exertional work.

*Id.*

This thorough analysis of the medical evidence provides context for the ALJ's determination that Dr. Kea's opinion – finding Plaintiff, e.g., unable to sit, stand, or walk for more than two hours, and rarely able lift ten pounds – is "inconsistent with the evidence in the record" and that Plaintiff's "relatively benign findings establish that she is not that limited". (Tr. 19). As the Sixth Circuit explained in *Crum*, "[n]o doubt, the ALJ did not reproduce the list of these

[inconsistent] treatment records a second time when she explained why [a treating physician's] opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion." 660 F. App'x at 457 (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). Here too, the undersigned finds the ALJ's discussion of the medical evidence earlier in her decision provides substantial evidence for her decision to assign "little weight" to Dr. Kea's opinion that Plaintiff had significantly more extreme restrictions.

RFC / Step Five[7]

Plaintiff also contends the RFC is unsupported because: 1) the ALJ failed to properly consider Plaintiff's obesity in accordance with SSR 02-1p, 2002 WL 34686281 and *Shilo v. Commissioner of Social Security*, 600 F. App'x 956 (6th Cir. 2015); 2) the ALJ failed to include an ambulatory aid in the RFC; 3) the ALJ did not properly consider Plaintiff's pulmonary limitations; 4) the ALJ did not properly consider Dr. Kea's opinion and improperly substituted her own judgment ; and 5) the ALJ should have adopted a restriction that Plaintiff would miss more than one day per month. The Commissioner responds that substantial evidence supports the ALJ's RFC determination and it should be affirmed.

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 416.929. In formulating an RFC, an ALJ must also consider and weigh medical opinions. 20 C.F.R. § 416.927. In so doing, the ALJ is to consider the medical specialty of a source, the supportability of the opinion, the

---

7. Plaintiff characterizes this as a "Step 5" argument, but her underlying challenges are not to the VE's testimony, but to the RFC underlying the question posed to the VE. *See* Doc. 10, at 9-14.

consistency of the opinion with a record as a whole, and any other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c).

The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. § 416.927(e)(1)(i). In formulating the RFC, the ALJ is not required to adopt any physician's opinion verbatim. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment.").

The RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(e)(2); *see also Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) (rejecting argument that RFC lacked the support of substantial evidence because no physician offered a corresponding RFC); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability.")

Accordingly, the ALJ bears the responsibility for determining an RFC based on all the relevant evidence. *See* 20 C.F.R. § 416.945(a)(3). This finding, like all other findings made by the ALJ, must be supported by substantial evidence. 42 U.S.C. § 405(g); *Walters*, 125 F.3d at 528.

The undersigned addresses each of Plaintiff's arguments in turn, apart from her argument as to Dr. Kea, which is addressed in the prior section.

*Ambulatory Aid*

First, Plaintiff contends the RFC lacks the support of substantial evidence because it fails to include an ambulatory aid. Plaintiff argues: "Plaintiff testified she needs a cane or walker[] to ambulate, which were prescribed by Dr. Kea. The ALJ acknowledged this testimony, but did not provide any rationale for disregarding it." (Doc. 10, at 11) (transcript citations omitted).

The ALJ cited Plaintiff's testimony that she "required either a cane or four-wheeled assistive device in order to walk." (Tr. 17). Immediately thereafter, the ALJ explained that she found Plaintiff's subjective statements about the intensity, persistence, and limiting effects of her symptoms (as a whole) "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* In the next several paragraphs, the ALJ cited numerous instances where medical records indicated Plaintiff had a normal gait. *See* Tr. 17 (citing Tr. 407 (March 2015), Tr. 611 (April 2015), Tr. 1199 (September 2015), Tr. 1395 (February 2016) Tr. 954 (March 2016), Tr. 855 (April 2016); Tr. 871 (May 2016)). Plaintiff cites her testimony that she needed an assistive device due to breathing difficulties. However, the ALJ evaluated Plaintiff's pulmonary impairment and noted that "the degree of objective abnormalities described by [Plaintiff's] clinicians appears inconsistent with the claimant's reports that her respiratory condition substantially degrades her ability to walk or perform a variety of other work activities." (Tr. 18). Specifically, the ALJ cited Plaintiff's June[8] 2015 pulmonary function test and the fact that "an exercise study failed to show any significant oxygen desaturations while walking at a normal pace." *Id.* (citing Tr. 1066-67, 1166). Specifically, the exercise oximetry study results noted: "While walking at a normal pace and breathing ambient air, the patient experienced no significant oxygen desaturations." (Tr. 1066). She was able to walk 528 feet and reported "mild

---

8. The ALJ misidentified the date of the pulmonary function test as August 2015. *See* Tr. 18.

dyspnea" at the end of the walk. *Id.* Although there are references in the record to Plaintiff's use of a cane or walker (Tr. 443, 962-63, 1312), there are also numerous records with no such reference, including the above-cited records indicating a normal gait (Tr. 407 (March 2015), Tr. 611 (April 2015), Tr. 1199 (September 2015), Tr. 1395 (February 2016) Tr. 954 (March 2016), Tr. 855 (April 2016); Tr. 871 (May 2016)). *See also* Tr. 1287 (note from October 2015 that Plaintiff "walked into therapy today independent without AD"). And, although Dr. Kea checked a box indicating Plaintiff required a cane (Tr. 1719), she did not indicate why the cane was medically necessary, nor did the evidence of record consistently mention the cane. Furthermore, the State agency physicians to review the record explicitly stated that "[r]ecent [medical evidence of record] does not indicate need for a cane or walker." (Tr. 110, 123) (April and August 2015 opinions). Based on the record as a whole, the undersigned thus finds the ALJ's decision not to include a cane in the RFC supported by substantial evidence.

*Obesity*

Next, Plaintiff argues the ALJ erred in her consideration of Plaintiff's obesity.

Obesity is defined as "a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281, at *2. When establishing the existence of obesity, the ALJ will "rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* at *3. Although obesity is no longer considered a listed impairment, it is considered a medical impairment, so it must be considered at each step of the ALJ's analysis. *Id.* at *1; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016). This is because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2002 WL 34686281, at *1. Specifically, the ALJ must consider "the effect obesity has upon the

individual's ability to perform routine movement and necessary physical activity within the work environment" and an individual's ability to sustain a function over time when formulating the RFC. *Id.* at *6.

However, the "ALJ is not required to use any 'particular mode of analysis' in assessing the effect of obesity." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (quoting *Bledsoe v. Barnhart*, 165 F. App'x. 408, 411-12 (6th Cir. 2006)). "[T]he ALJ does not need to make specific mention of obesity if [s]he credits an expert's report that considers obesity." *Bledsoe*, 165 F. App'x. at 412. If all of the evidence the ALJ relies on considers the claimant's obesity, then the ALJ will have satisfied the regulations. *Caldwell v. Berryhill*, 2017 WL 957538, at *6 (E.D. Ky.) (upholding ALJ's decision, in part, because Plaintiff did not identify any additional limitations that should have been incorporated and ALJ considered medical evidence that took obesity into consideration).

Here, the ALJ explicitly considered Plaintiff's obesity:

> I have considered the effects of the claimant's obesity in accordance with SSR 02-1p. However, there is no evidence of any specific or quantifiable impact of the claimant's obesity on her pulmonary, musculoskeletal, endocrine, or cardiac functioning and the highest body mass index has not exceeded 35. (C12F/11). As such, I do not find that it is severe.

(Tr. 13).

The case relied on by Plaintiff, *Shilo*, is distinguishable because the plaintiff in that case previously received disability benefits due to his morbid obesity and the ALJ determined that his obesity was a severe impairment. 600 F. App'x at 957. By contrast, here, Plaintiff points to nothing other than her own testimony that her obesity causes any work-related limitations. While Plaintiff correctly notes that her medical records mention her obesity and BMI calculations, these references are passing and do not indicate any functional limitations. Plaintiff argues the ALJ failed to

"consider all the medically documented evidence of obesity and the cumulative effects of obesity on disturbances to Plaintiff's severe pulmonary disease" (Doc. 10, at 11), but she points to no evidence connecting the two. *See* 20 C.F.R. § 416.912(a)(1) ("In general, you have to prove to us that you are . . . disabled.").

Even Dr. Kea, Plaintiff's treating physician, did not list obesity as a condition affecting Plaintiff's ability to work. *See* Tr. 1716-20. Furthermore, the State agency reviewing physicians, to whom the ALJ assigned partial weight, both had evidence of Plaintiff's obesity and did not opine that it was functionally limiting. *See* Tr. 110-11, 123-24. SSR 02-1p dictates that obesity must be evaluated on a case by case basis because "[o]besity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." 2002 WL 24686281, at *6. The ALJ did precisely that here, finding Plaintiff's obesity did not affect her ability to work, and that decision is supported by substantial evidence.

*Pulmonary Restrictions*

Third, Plaintiff argues the RFC does not adequately account for her pulmonary limitations. Plaintiff notes that this finding "is not supported by Dr. Kea" and the non-examining sources did not review subsequent records. (Doc. 10, at 12). She notes that "[n]o other acceptable medical sources addressed this severe impairment" and "[t]hus, the 'frequent exposure finding is not based upon substantial evidence." *Id.*

As noted above, the RFC determination is one reserved to the ALJ, and the fact that no medical opinion source reviewed subsequent records is not *per se* error. *See Shepard*, 705 F. App'x at 442-43. Thus, contrary to Plaintiff's argument, the ALJ did not err simply because she formulated an RFC that did not correspond to a physician's opinion. *See Poe*, 342 F. App'x at 157; *Rudd*, 531 F. App'x at 728.

24

The ALJ here thoroughly addressed Plaintiff's pulmonary function. *See* Tr. 18-19. After so doing, she explained that Plaintiff's "reportedly successful response to treatment, the numerous benign respiratory examinations appearing in the claimant's treatment records, and the failure of any significant oxygenation desaturation with normal walking suggest that these limitations are somewhat modest." (Tr. 19). This rationale is supported by substantial evidence in the record. *See* Tr. 446 (December 2014 – negative pulmonary findings); Tr. 407 (March 2015 – negative pulmonary findings); Tr. 610 (April 2015 – negative pulmonary findings); Tr. 1047 (June 2015 – PFT and exercise oximetry test); Tr. 1199 (August 2015 – normal pulmonary findings); Tr. 854 (April 2016 –noting Plaintiff's asthma was "recurrent", "intermittent[]", "ha[d] been resolved" and that "[t]reatment provided significant relief"); Tr. 871 (May 2016 – diagnosing "moderate" COPD based on June 2015 PFT and noting it "appear[ed] to be well controlled with current regimen"). Furthermore, the ALJ acknowledged Plaintiff's breathing-related emergency room visits, but noted that her breathing improved each time. (Tr. 18) (citing Tr. 886, 888, 914, 945, 950). And she noted that the most recent of these visits was in March 2016, but "[o]f particular relevance here, at a clinical visit in April of 2016, the claimant's treatment was noted to have provided 'significant' relief, and the claimant underwent an unremarkable pulmonary evaluation." (Tr. 18-19) (citing Tr. 854-55). The ALJ also noted Plaintiff denied respiratory symptoms in June and September 2016. (Tr. 19) (citing Tr. 865, 1479).

Significantly, in response to a question to "[p]lease describe any other limitations (such as psychological limitations, limited vision, difficulty hearing, need to avoid temperature extremes, wetness, humidity, noise, dust, fumes, gases or hazards, etc.) that would affect your patient's ability to work at a regular job on a sustained basis", Dr. Kea responded: "[history of] mental health issues exacerbated by illness." (Tr. 1720). That is, even when given an example of exposure

to pulmonary irritants, Dr. Kea offered no such limitation on Plaintiff's ability to work. Additionally, the state agency physicians opined Plaintiff had *no* environmental limitations. (Tr. 111, 123). The ALJ, however, determined that the record as a whole indicated some degree of limitation, and thus limited Plaintiff to "frequent" exposure to pulmonary irritants. (Tr. 19). For the reasons discussed above, the undersigned finds this determination supported by substantial evidence.

*Absenteeism*

Plaintiff also argues the RFC is unsupported because it fails to account for – or explain the rejection of – Dr. Kea's opinion that Plaintiff would miss four or more days of work per month. As set forth in greater detail above, the ALJ's decision to discount Dr. Kea's opinion as a whole is supported by substantial evidence. And in assigning Dr. Kea's opinion "little weight", the ALJ specifically acknowledged the absenteeism portion of her opinion. *See* Tr. 19. Because, as discussed above, the ALJ's decision to discount Dr. Kea's opinion is supported by substantial evidence, the undersigned finds no error in the ALJ's failure to include Dr. Kea's absenteeism opinion in the RFC. The ALJ's discussion of the record as a whole provides sufficient explanation for her rejection of such a limitation. *See, e.g., Flynn v. Comm'r of Soc. Sec.*, 2018 WL 3762721, at *9 (N.D. Ohio) (noting "[t]he ALJ implicitly rejected such a severe limitation by demonstrating the above listed medical evidence of record fails to support such an estimate"), *report and recommendation adopted*, 2018 WL 3752264; *see also Saulic v. Colvin*, 2013 WL 5234243, at *10 (N.D. Ohio) ("Here, the ALJ evaluated the medical evidence and hearing testimony, and provided sufficient explanation for his implicit rejection of Dr. Dankoff's opinion regarding Saulic's expected work absences.").

Finally, Plaintiff frames her argument as a "Step Five" argument. To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). Because the undersigned finds the ALJ's RFC is supported by substantial evidence, and the hypothetical question posed to the VE here matches the RFC, there is no Step Five error.

Although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. For the reasons discussed above, the undersigned finds substantial evidence supports the ALJ's conclusions in this case.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and recommends the decision be affirmed.

    s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).